**Opinion issued April 23, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00985-CV

———————————

## IN THE INTEREST OF A.S., A CHILD

---

**On Appeal from the 313th District**
**Harris County, Texas**
**Trial Court Case No. 2017-00333J**

---

## MEMORANDUM OPINION

L.G. appeals from the trial court's judgment terminating her parental rights to her daughter, A.S. In four issues, L.G. contends that the evidence is legally and factually insufficient to support the termination findings under subsections (D), (E), (N), and (O) of Texas Family Code section 161.001(b)(1), and the finding that termination of her parental rights is in the child's best interest. We affirm.

## Background

On December 21, 2016, the Department of Family and Protective Services received a referral alleging neglectful supervision of one-year old A.S. following an incident of domestic violence. The report stated that J.S., A.S.'s father, threw L.G. against a door and repeatedly punched her in the stomach. At the time of the incident, A.S. was in the living room with L.G.'s friend who called the police. J.S. was arrested for domestic violence.[1]

During the investigation of the referral, J.S. told the Department caseworker that he and L.G. had "used meth." On January 10, 2017, the Department asked L.G. to take a drug test. After taking the test, but before being notified of the results, L.G. gave power of attorney to her mother, S.P., because she feared the Department would remove A.S. L.G. tested positive for marijuana.

S.P. told the caseworker that she offered to pay for L.G. to go to rehab but L.G. refused. S.P. also stated that she kicked L.G. and J.S. out of her house because of their drug use and the domestic violence. The Department subsequently learned that S.P. had prior CPS history and criminal history involving a DUI, felony endangerment of a child, and driving with a suspended license, and it removed A.S. from her care.

---

[1]    J.S. had previously been convicted of assaulting a family member in 2012.

On January 23, 2017, the Department filed an Original Petition for Protection of a Child for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship. The trial court signed an order granting the Department emergency temporary managing conservatorship of A.S. that same day.

On February 1, 2017, the trial court granted J.S. community supervision in connection with his assault of L.G.

On February 2, 2017, the trial court held an adversary hearing at which L.G. and J.S. appeared. The court found that (1) there was a danger to the physical health or safety of A.S. caused by an act or failure to act of the person entitled to possession; (2) an urgent need for A.S.'s protection requiring the immediate removal of A.S; and (3) notwithstanding reasonable efforts to eliminate the need for removal, a substantial risk of continuing danger if the child returned home. The court continued the Department's temporary managing conservatorship of A.S. and set a status hearing for March 21, 2017. The court also ordered L.G. and J.S. to submit to drug testing. Both parents tested positive for amphetamine, methamphetamine, and marijuana.

The Department created family service plans for L.G. and J.S. L.G.'s service plan, which reflected that the parents had a prior open family-based safety services plan shortly after A.S. was born, noted that L.G. seemed to take the allegations underlying A.S.'s removal less seriously than the Department and that she exhibited

3

a lack of attachment to A.S.  The plan also noted that, as of February 21, 2017, neither parent had contacted the Department regarding A.S.'s well-being and or appeared at their scheduled permanency conference on February 16, 2017.  The service plan's stated goals were that L.G. demonstrate (1) an ability to change the pattern of the behavior that resulted in the abuse/neglect; (2) an ability to provide basic necessities for A.S.; and (3) an acceptance of her responsibility as a parent. L.G.'s plan required her to (1) maintain monthly contact with her caseworker; (2) participate in all recommended services, permanency conferences, family visits, and court hearings; (3) submit to random urinalysis tests; (4) participate in a drug and alcohol assessment and follow related recommendations; (5) participate in parenting classes and domestic violence classes; (6) maintain stable employment and housing; and (7) participate in a psychosocial evaluation.

On March 21, 2017, the trial court held a status hearing.  Neither L.G. nor J.S. appeared at the hearing.  At the conclusion of the hearing, the trial court signed an order finding the parents' service plans, with a stated goal of returning the child, to be reasonable and tailored to address the specific issues identified by the Department, and the trial court approved the services plans.  The same day, the trial court ordered L.G. to submit to drug testing.  L.G. tested positive for marijuana, amphetamine, and methamphetamine.

On May 18, 2017, the National Screening Center issued a letter stating that L.G. had been ordered to provide samples for drug testing but she walked out before the sample could be collected, which is considered a "refusal/positive test."

On May 22, 2017, A.S.'s foster parents filed a petition to intervene in the Department's suit, seeking to adopt A.S.

On July 6, 2017, the trial court conducted a permanency hearing. Neither L.G. nor J.S. appeared in person. Following the hearing, the trial court signed an order finding that neither parent had demonstrated adequate and appropriate compliance with the service plan. The court's order further stated that the service plan and/or permanency progress report on file represented the actions the court required for the parents to regain custody. The trial court ordered that S.P. and A.W.P., the maternal grandparents, submit to a home study to be conducted within two weeks.

On December 18, 2017, the trial court revoked J.S.'s community supervision after it found that he had violated the terms and conditions of his community supervision by failing to refrain from engaging in criminal activity and sentenced him to three years' confinement. On April 23, 2018, L.G. was arrested for prostitution and possession of a controlled substance.

On May 4, 2018, the Department filed its permanency report with the trial court. The report stated that L.G. contacted the Department and said that she would like to work services. As of the date of the report, L.G. had not started any of the

5

services on her family service plan and had attended only three of the six scheduled parent/child visits. The report noted that on April 24, 2017, L.G. "came into the agreement with the agency that the primary goal of unrelated adoption would be in the best interest of [A.S.]." The report further noted that L.G. "stated that she will relinquish her rights if she needs to for the best interest of [A.S.]" and that "if [A.S.] will be adopted she would like for the current caregivers to do so." The report stated that A.S. "is doing really well in her current placement" and "has developed a strong bond with her current foster family" with whom she was placed on January 20, 2017. The report also noted that the Wellness Counseling Center, which administers the required drug assessments listed in her family plan, had attempted to contact L.G. eight times.

On June 6, 2018, the court held a permanency hearing at which L.G. did not appear. The trial court found that L.G. had not demonstrated adequate and appropriate compliance with her service plan.

Trial began on July 9, 2018. Neither L.G. not J.S. appeared. The intervening parties—the foster parents and A.S.'s maternal grandparents—advised the court that they had reached an agreement involving visitation with A.S. in the event that L.G.'s and J.S.'s parental rights were terminated. The trial court informed the parents' attorneys that while they had received information that their clients might want to

relinquish their parental rights to A.S., the trial court would give them only two weeks to procure those relinquishments; if they did not, the trial would proceed.

On August 7, 2018, the trial resumed. Neither L.G. nor J.S. appeared. Prior to calling its first witness, the Department introduced numerous exhibits, which the trial court admitted, including L.G.'s family service plan, criminal history, and drug test results.

Claudia Riggins, a Department conservatorship caseworker, testified that A.S. came into the Department's care because of L.G.'s drug use and domestic violence. Riggins testified that, once conservatorship began, L.G. and J.S. were scheduled for drug tests, their family service plans were created, and their visitation schedules set up. Despite the Department's multiple attempts to contact L.G. and mailing her family service plan to her, LG. stopped replying to all communications from the Department and no longer attended visitation with A.S. Riggins testified that, in February 2017, L.G. tested positive for methamphetamine, marijuana, marijuana metabolite, and amphetamine, and in, March 2017, she again tested positive for methamphetamine, marijuana, and marijuana metabolite.

Riggins testified that the Department's file did not include any certificate of completion for any services by L.G. She testified that although L.G. was initially scheduled for weekly visits with A.S., the visits were changed to monthly visits because L.G. had cancelled a majority of them. Riggins testified that L.G. attended

7

only two of her eight scheduled visits with A.S. Riggins stated that the Department was asking the court to terminate L.G.'s parental rights because she did not complete any of the items of her family service plan, and she was arrested during the pendency of the case. She further testified that L.G.' actions created a dangerous and unstable environment for A.S. Riggins stated that L.G. had provided a few outfits and a couple of toys at a couple of her visits with A.S.

Riggins testified that A.S. was doing very well in her current placement and was very close to her foster parents as well as their sons. Riggins stated that A.S. calls her foster parents "mom" and "dad" and interacts with the sons like siblings. A.S. does gymnastics and appears very happy with her foster family. Riggins testified that the foster parents have demonstrated an ability to provide a safe and stable home for A.S. now and in the future. She stated that neither L.G. nor J.S. has demonstrated that they could provide a safe and stable environment for A.S. Riggins stated that she believed that termination of L.G.'s and J.S.'s parental rights were in A.S.'s best interest.

On cross-examination, Riggins testified that the case had begun in October 2015, shortly after A.S. was born, with a family-based safety services plan. Riggins testified that L.G. successfully worked her services in the family-based case which enabled A.S. to stay with her until the current case was filed in January 2017. Riggins stated that L.G. had expressed a desire to relinquish her parental rights on

8

and off throughout the pendency of the case but never executed a written relinquishment.

Carrie Hendricks-Helm, the advocacy coordinator, testified that Child Advocates supported the Department's request to terminate the parental rights of both L.G. and J.S. because the parents had demonstrated an inability to care for A.S. Hendricks-Helm stated that she visited the foster family monthly and that A.S. was very bonded with her foster family with whom she had spent the majority of her young life. She testified that A.S. participated in activities such as gymnastics and that she enjoyed going to see her brothers play baseball.

On cross-examination, Hendricks-Helm testified that the last time she saw L.G. was at a family visit with A.S. She testified that L.G. used a lot of vulgar language during her visit and had to be told by the monitor to stop. She further testified that A.S. was not comfortable with L.G. and did not appear bonded with her, and that A.S. mostly sat with her maternal grandmother.

The foster mother testified that A.S. has been living with her family for sixteen months and has bonded with her sons whom A.S. calls her "bubbies." She testified that A.S. takes a gymnastics class and will take a dance class in the fall. The foster mother testified that she and her husband wish to adopt A.S.

At the conclusion of trial, the Department requested that the foster parents be named as joint sole managing conservators and A.S.'s maternal grandparents be

named non-parent possessory conservators.  The Department requested that L.G.'s parental rights be terminated based on subsections (D), (E), (N), and (O) of Texas Family Code section 161.001(b)(1), and that J.S.'s parental rights be terminated on based on subsections (D), (E), (N), (O), and (Q).  The Department also asked that the visitation schedule that was outlined at the July 9, 2018 hearing be memorialized in the order.

The trial court found clear and convincing evidence supporting (1) termination of L.G.'s parental rights to A.S. under subsections (D), (E), (N), and (O), (2) termination of J.S.'s parental rights under subsections (D), (E), (N), (O), and (Q), and (3) a finding that termination of L.G.'s and J.S.'s parental rights was in the best interest of the child.  The trial court named the foster parents as joint sole managing conservators and A.S.'s maternal grandparents as non-parent conservators.  The trial court signed a final decree of termination on October 11, 2018.  This appeal followed.

## Discussion

On appeal, L.G. challenges the legal and factual sufficiency of the evidence to support the predicate findings supporting termination under subsections (D), (E), (N), and (O) of Texas Family Code section 161.001(b)(1).  She also challenges the legal and factual sufficiency of the evidence supporting the trial court's best interest finding under section 161.001(b)(2).

10

## A. Burden of Proof and Standard of Review

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S .W.3d 355, 361 (Tex. 2003). A parent's right to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

In a case to terminate parental rights under section 161.001 of the Family Code, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d at 362.

When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that there existed grounds for termination under section 161.001(b)(1) and that termination was in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d at 266. In doing so, we examine all evidence in the light most favorable to the finding, assuming that the "factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.*, 96 S.W.3d at 266. We must also disregard all evidence that the factfinder could have reasonably disbelieved or found to have been incredible. *Id.*

When conducting a factual sufficiency review, we consider and weigh all of the evidence including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

## B. Family Code Section 161.001(1)(O)—Failure to Comply with a Court Order

In her third issue, L.G. contends that the evidence is legally and factually insufficient to support termination of her parental rights under section 161.001(b)(1)(O).

For a court to terminate parental rights under subsection (O), the court must find by clear and convincing evidence that the parent:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE § 161.001(b)(1)(O). Texas courts generally take a strict approach to subsection (O)'s application. *In re D.N.*, 405 S.W.3d 863, 877 (Tex. App.—Amarillo 2013, no pet.). A parent's failure to complete one requirement of her family service plan supports termination under subsection (O). *In re J.M.T.*, 519 S.W.3d 258, 267 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

L.G. does not dispute that the Department had temporary managing conservatorship of A.S. for more than nine months and that the Department removed A.S. from her care as a result of L.G.'s abuse or neglect of A.S. Rather, L.G. contends that the trial court gave too much deference to the Department's "inherently subjective" determination that she had not complied with the provisions of her

13

family service plan. She argues that if the Department had done a better job of communicating with her, her parental rights would not have been terminated on this ground.

L.G.'s family service plan, which was admitted at trial, required her to maintain monthly contact with her caseworker and participate in all recommended services, permanency conferences, family visits, and court hearings. L.G. also had to submit to random urinalysis tests, participate in a drug and alcohol assessment and follow related recommendations, participate in parenting classes and domestic violence classes, maintain stable employment and housing, and participate in a psychosocial evaluation.

The trial court's orders following the three permanency hearings held in this case show that L.G. did not appear for any of the hearings. L.G. also did not appear at trial on July 9, 2018, or when trial resumed on August 7, 2018. Riggins testified that L.G. attended only two of her eight scheduled visits with A.S. The record also shows that L.G. had been ordered to provide samples for drug testing on May 18, 2017, but that she walked out before the samples could be collected. Riggins testified that L.G. had not completed any of the items of her family service plan by the time of trial.

The evidence conclusively showed that L.G. did not comply with the requirements of her court-ordered service plan. *See In re M.C.G.*, 329 S.W.3d 674,

14

675 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (determining that parent's failure to complete one requirement of her service plan supports termination); *In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.) ("Despite [parent]'s achievement of some of the plan's goals, the evidence establishes that other requirements of the plan were not achieved."). Moreover, the trial court did not need to rely on the Department's determination in this regard because the record shows that L.G. failed to appear at each of the permanency hearings, as reflected in the trial court's orders, and did not appear at trial. With regard to L.G.'s assertion that the Department did not do an adequate job communicating with her, Riggins testified that the Department made numerous attempts to contact L.G. and mailed a family service plan to her but she stopped replying to all communications from the Department.

Reviewing all the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable factfinder could have formed a firm belief or conviction as to the truth of the termination findings under subsection (O). We further conclude that, in light of the entire record, any "disputed evidence that a reasonable fact finder could not have credited in favor of the endangerment findings is not so significant that a fact finder could not reasonably have formed a firm belief or conviction" as to the truth of these termination findings. *See In re H.R.M.,* 209 S.W.3d at 108. Accordingly, the evidence is both legally and factually sufficient to

15

support the termination findings under Family Code Section 161.001(b)(1)(O).[2] We overrule L.G.'s third issue.

## C. Best Interest of the Child

In her fourth issue, L.G. contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in A.S.'s best interest.

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding: the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking

---

[2] Having determined that the evidence is sufficient to support the trial court's finding on this statutory ground, we need not consider whether the evidence would support subsections (D), (E), or (N), the other predicate grounds for termination challenged in L.G.'s first and second issues. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (affirming termination decree based on one predicate without reaching second predicate found by the trier of fact and challenged by parent).

16

custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). As noted, this list of factors is not exhaustive, and evidence is not required on all of the factors to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Moreover, we note that evidence supporting termination under one of the grounds listed in section 161.001(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(1) grounds and best interest).

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the

child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

### 1. Desires of the Child

L.G. argues that, in light of A.S.'s young age, we must presume that she is bonded with her foster family as well as with L.G. and, therefore, this factor weighs against termination.

"When children are too young to express their desires, the factfinder may consider whether the child has bonded with the proposed adoptive family, are well-cared for by them, and they have spent minimal time with a parent." *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a best interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Evidence about the present and future placement of the child is relevant to the best interest determination. *See In re C.H.*, 89 S.W.3d at 28.

A.S. was two years old at the time of trial and, therefore, too young to express her desires. *See In re T.G.R.-M.*, 404 S.W.3d 7, 16 (Tex. App.—Houston [1st Dist.] 2013, no pet.). There was no evidence that A.S. was bonded with L.G. or that L.G. was bonded with her child. When the trial began, the court noted that the parents'

attorneys had received information that their clients might want to relinquish their parental rights to A.S. Riggins testified that L.G. had expressed a desire to relinquish her parental rights on and off throughout the pendency of the case. She also testified although L.G. was initially scheduled for weekly visits with A.S., the visits were changed to monthly visits because L.G. had cancelled a majority of them and L.G. attended only two of her eight scheduled visits with A.S. During one of the visits, L.G. used vulgar language and had to be told by the monitor to stop. Riggins testified that A.S. was not comfortable with L.G. during the visit, did not appear bonded with her, and sat mostly with her grandmother.

Riggins testified that A.S. was very close to her foster parents as well as their sons, that A.S. calls her foster parents "mom" and "dad," and interacted with the sons like siblings. Hendricks-Helm, the advocacy coordinator, testified that she visited the foster family monthly and that A.S. was very bonded with the family with whom she had spent the majority of her young life. The foster mother testified that A.S. has been living with her family for sixteen months and that A.S. is very bonded with her family. This evidence supports the trial court's best interest finding under the first *Holley* factor.

## 2. Present and Future Physical and Emotional Needs of the Child

Riggins testified that L.G. had provided a few outfits and a couple of toys during her visits with A.S. but that L.G. had not demonstrated that she could provide

19

a safe and stable environment for A.S. She testified that the foster parents had demonstrated an ability to provide a safe and stable home for A.S. currently and in the future. Similarly, Henricks-Helm testified that both L.G. and J.S. had demonstrated an inability to care for A.S. during the pendency of the case. She testified that A.S. is involved in activities with her foster family, participates in gymnastics, and enjoys going to see her brothers play baseball. This evidence supports the trial court's best interest finding under the second *Holley* factor.

### 3. Present and Future Emotional and Physical Danger to the Child and Parents Acts or Omissions

The third *Holley* factor is the present and future physical danger to the child. *See Holley,* 544 S.W.2d at 371–72. The eighth factor considers acts or omissions of the parent that indicate the parent-child relationship is improper. *See id.*

The evidence shows that the Department first removed A.S. from L.G.'s care following an incident of domestic violence for which J.S. was arrested. A.S. was nearby in the living room with L.G.'s friend at the time of the incident. The trial court heard evidence that this was not the first time that J.S. had engaged in domestic violence and that he had previously been convicted of violence against a family member in 2012. S.P. also told the Department caseworker that she kicked L.G. and J.S. out of her house because of the domestic violence and the parents' drug use.

The evidence also shows that L.G. had a pattern of illegal drug use both before A.S.'s removal and during the pendency of the case. During the investigation of the

20

initial referral, J.S. told the caseworker that he and L.G. had "used meth." In January 2017, L.G. tested positive for marijuana. In February 2017, she tested positive for amphetamine, methamphetamine, marijuana, and marijuana metabolite. In March 2017, she tested positive for marijuana, amphetamine, and methamphetamine. In May 2017, she showed up for a court-ordered drug test but walked out before the sample could be collected which the testing center considered a refusal/positive test. As noted above, S.P. told the caseworker that she kicked L.G. and J.S. out of the house because of the domestic violence and their drug use. She also told the caseworker that she offered to pay for L.G. to go to rehab but that L.G. refused. The trial court also heard evidence that in April 2018, while this case was pending, L.G. was arrested for prostitution and possession of a controlled substance.

A parent's past conduct is probative of her future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). L.G.'s inability to refrain from drug use during the pendency of the case, as well as her arrest for possession of a controlled substance, reflects an inability to perceive the danger that parental drug use would pose to a child. *See In re G.A.*, No. 01-11-00565-CV, 2012 WL 1068630, at *6 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (mem. op.) (concluding that father's concealment of drug use and continued relationship with mother who abused drugs demonstrated father's inability to perceive danger that parental drug use posed to child). Further, the

21

evidence was sufficient to show that L.G. endangered A.S. by remaining with J.S.—who had been previously convicted of assaulting a family member, admitted his drug use to the Department, and tested positive on his court-ordered drug test—thereby exposing A.S. to an unsafe environment. *See In re M.M.M.*, No. 01-17-00980-CV, 2018 WL 1954178, at \*12 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (mem. op.) ("[E]vidence of a child's exposure to domestic violence is supportive of an endangerment finding."); *In re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at \*6-7 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.) (concluding father's crimes, including drug-related offenses and domestic violence occurring before and after children's births, supported trial court's best interest finding); *L.B. v. Tex. Dep't of Family & Protective Servs.*, No. 03-09-00429-CV, 2010 WL 1404608, at \*5 (Tex. App.—Austin Apr. 9, 2010, no pet.) (mem. op.) (concluding exposing child to domestic violence and drug use supports factfinder's conclusion that mother engaged in course of conduct that endangered children).

This evidence supports the trial court's best interest finding under the third and eighth *Holley* factors.

### 4. Parental Abilities of Individuals Seeking Custody, Plans for the Child, and Stability of Home or Placement

The fourth *Holley* factor is the parental abilities of the individuals seeking custody. *See Holley,* 544 S.W.2d at 371–72. The sixth factor considers the plans

for the child by the individuals or agency seeking custody. *See id.* The seventh factor looks at the stability of the home or proposed placement. *See id.*

Among other tasks, L.G.'s service plan required her to participate in parenting classes. Two of the stated goals of her service plan were that she demonstrate an ability to provide basic necessities for A.S. and an acceptance of her responsibility as a parent. The evidence shows that L.G. did not attend a parenting class. Riggins testified that L.G. provided a few outfits and a couple of toys at two of her visits with A.S. "but that was it." L.G. attended only two of her eight scheduled visits with A.S. and, during one of them, she used vulgar language and had to be told to stop by the monitor. On L.G.'s service plan, the caseworker noted that L.G. seemed to take the allegations underlying A.S.'s removal less seriously than the Department. L.G. also did not maintain contact with the Department to ensure the well-being of A.S. L.G.'s continued drug use during the case, as well as her arrest for prostitution and possession of a controlled substance, also demonstrate a lack of parental ability and acceptance of her responsibilities as a parent. *See In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.) (noting parental drug abuse is reflective of poor judgment and is also factor to be considered in best interest analysis); *Wischer v. Tex. Dep't of Family & Protective Servs.*, No. 03-12-00165-CV, 2012 WL 3793151, at *7 (Tex. App.—Austin Aug. 29, 2012, no pet.) (mem. op.).

Riggins and Hendricks-Helm testified that the foster parents have demonstrated an ability to care for A.S. during the pendency of the case. A.S. considers her foster parents to be her mom and dad and her foster brothers to be her siblings, and she participates in gymnastics and activities with the family. The evidences shows that A.S. is doing very well with her foster family and that the parents wish to adopt her. There was no evidence at trial regarding L.G.'s plans for A.S. should she be returned to her care.

Riggins and Hendricks-Helm also testified that the foster parents demonstrated an ability to provide a safe and stable environment for A.S. currently and in the future, whereas L.G. had not shown an ability to provide a safe and stable home for her child. The trial court heard testimony that A.S. was happy in her foster family and very bonded to her foster parents and their sons with whom she had spent the majority of her young life. The trial court also heard evidence that L.G. had been arrested for prostitution and possession only a few months before trial. This evidence supports the trial court's best interest finding under the fourth, sixth, and seventh *Holley* factors.

Viewing all the evidence in the light most favorable to the judgment, we conclude that a factfinder could have formed a firm belief or conviction that termination of L.G.'s parental rights is in A.S.'s best interest. *See J.F.C.*, 96 S.W.3d at 265–66. In light of the entire record, the disputed evidence that a reasonable

factfinder could not have credited in favor of the best interest finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction that termination of L.G.'s parental rights is in her child's best interest. *See In re H.R.M.,* 209 S.W.3d at 108. After considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in the best interest of the child. Accordingly, we overrule L.G.'s fourth issue.

## Conclusion

We affirm the trial court's judgment.



Russell Lloyd
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.